# UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | |
|---|---|
| **NELSON MENDEZ-HERNANDEZ**<br><br>                     Plaintiff-Petitioner,<br><br>v.<br><br>**KRISTI NOEM**, in their official capacity as Secretary of the United States Department of Homeland Security;<br>**MARCO RUBIO**, in their official capacity as Secretary of State of the United States;<br>**PAMELA BONDI**, in their official capacity as Attorney General of the United States;<br>**TODD M. LYONS**, in their official capacity as Acting Director of the United States Immigration and Customs Enforcement;<br>**PETER BERG**, in their official capacity as St. Paul Field Office Director for Enforcement and Removal Operations, United States Immigration and Customs Enforcement; and<br>**MICHAEL KIRN**, in their official capacity as Phelps County Sheriff, Official of Phelps County Jail;<br><br>                Defendant-Respondents. | Case No. _____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF; PETITION FOR HABEAS CORPUS** |

1

## INTRODUCTION

1. This lawsuit seeks the immediate release of Plaintiff-Petitioner Nelson Mendez-Hernandez ("Petitioner") from unlawful detention in violation of his constitutional and statutory rights.

2. Petitioner was arrested in Schyler, Nebraska on or about January 7, 2026. Omaha Deportation Officers with the Department of Homeland Security ("DHS") arrested and detained him in Phelps County Jail, Nebraska. He remains detained at Phelps County Jail, in the custody of DHS and ICE today, without access to legal counsel or other basic needs.

3. Petitioner has been in the United States for approximately 5 years and has a permanent residence in Omaha, Nebraska. He has two United States citizen daughters, both under the age of four.

4. Petitioner has never been arrested or convicted of any crime aside from his recent arrest for driving while under the influence of alcohol, which is his first offense.

5. Petitioner's detention became unlawful on February 2, 2026, when the Immigration Judge ("IJ") adjudicating his case declined to conduct a bond redetermination hearing. Ex. 1, Order of the Immigration Judge (Feb. 2, 2026). His continued detention is an unlawful violation of due process and is *ultra vires*.

6. Petitioner is represented in immigration proceedings by counsel and is statutorily eligible for relief from removal in the form of Asylum and Withholding of Removal, also known as I-589, pursuant to 8 CFR § 208. He is physically present in the United States and has a well-founded fear of harm or persecution if he were returned to his

home country. Petitioner is also statutorily eligible for voluntary departure if any other relief could not be sustained in court.

7. Petitioner respectfully requests this Court grant the instant petition for a writ of habeas corpus to 28 U.S.C. § 2241 and enjoin Respondent's continued detention of Petitioner to ensure his due process rights. In the alternative, he respectfully requests the Court order Respondents to show cause why this Petition should not be granted within three days.

<strong><u>JURISDICTION AND VENUE</u></strong>

8. Petitioner is detained in civil immigration custody at Phelps County Jail in Holdrege, Nebraska. He has been detained since on or about, January 7, 2026. He has no criminal convictions.

9. This action arises under the Constitution of the United States and the Immigration Nationality Act (INA), 8 U.S.C. § 1101 *et seq*.

10. This Court has subject matter jurisdiction under 28 U.S.C. § 2241 (habeas corpus), 28 U.S.C. § 1331 (federal question), and where applicable Article I § 9, cl. 2 of the United States Constitution (Suspension Clause). This Court may grant relief pursuant to 28 U.S.C. § 2241, the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., and the All Writs Act, 28 U.S.C. § 1651.

11. Venue is proper in the District of Nebraska under 28 U.S.C. § 1391, because at least one Defendant is in this District, Petitioner is detained in this District, and a substantial part of the events giving rise to the claims in this action took place in

this District. Venue is also proper under 28 U.S.C. § 2243 because the immediate custodians of Petitioner reside in this District.

**REQUIREMENTS OF 28 U.S.C. § 2243**
**Writ of Habeas Corpus Issuance, Return, Hearing, and Decision**

12. The Court either must grant the instant petition for writ of habeas corpus of issue an order to show cause to Respondents, unless Petitioner is not entitled to relief. If the Court issues an order to show cause, Respondents must file a response "within three days" unless this Court permits additional time for good cause, which is not to exceed twenty days. 28 U.S.C. § 2243.

13. Habeas corpus is "perhaps the most important writ known to the constitutional law . . . affording as it does a *swift* and imperative remedy in all cases of illegal restraint or confinement." *Fay v. Noia*, 371 U.S. 391, 400 (1963) (emphasis added). "The writ of habeas corpus, challenging illegality of detention, is reduced to a sham if the trial courts do not act within a reasonable time." *Jones v. Shell*, 572 F.2d 1278, 1280 (8th Cir. 1978).

14. Due to the nature of this proceeding, Petitioner asks this Court to expedite proceedings in this case as necessary and practicable for justice.

**PARTIES**

15. Petitioner is approximately twenty-two years old. He was born in Guatemala and came to the United States in 2020. Petitioner is the subject of a Removal Proceeding based upon the charges of being present in the U.S. without being "admitted or paroled, or who arrived in the [U.S.] at any time or place other than designated by

the Attorney General" under INA § 212 (a)(4)(A)(i), codified at 8 U.S.C. § 1182 (a)(4)(A)(i). He has been in civil immigration detention since January 7, 2026.

16. Respondent Marco Rudio is named in their official capacity as the U.S. Secretary of State. In this capacity, among other things, they have the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States."

17. Respondent Kristi Noem is named in their official capacity as the Secretary of State for the U.S. Department of Homeland Security ("DHS"). DHS is a department of the executive branch of the U.S. government that is tasked with, among other things, administering and enforcing the federal immigration laws. Secretary Noem is ultimately responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a). Secretary Noem is legally responsible for any effort to detain and remove the Petitioner and as such is a legal custodian of Petitioner.

18. Respondent Todd M. Lyons is named in their official capacity as the Acting Director of U.S. Immigration and Customs Enforcement ("ICE"). ICE is the agency within DHS that is specifically responsible for managing all aspects of the immigration enforcement process, including immigration detention. ICE is responsible for apprehension, incarceration, and removal of noncitizens from the United States and as such Acting Director Lyons is a legal custodian of Petitioner.

19. Respondent Pamela Bondi is named in their official capacity as the U.S. Attorney General. Attorney General Bondi is responsible for continuing a custody case against a noncitizen under 8 CFR § 1003.6(d).

20. Respondent Peter Berg is named in their official capacity as the Field Office Director for the St. Paul Office of ICE. Director Berg is responsible for the enforcement of the immigration laws within this district, and for ensuring that ICE officials follow the agency's policies and procedures. Director Berg is a legal custodian of Petitioner.

21. Respondent Michael Kirn is named in their official capacity as the Sheriff of Phelps County and the Official of the Phelps County Jail. They have immediate physical custody of Petitioner pursuant to an agreement with ICE to detain noncitizens and is a legal custodian of Petitioner.

## FACTUAL ALLEGATIONS

22. Petitioner was arrested in Schuyler, Nebraska on January 7, 2026. He currently remains detained in ICE custody in Phelps County Jail in Holdredge, Nebraska.

23. On February 9, 2026, immigration counsel for Petitioner submitted a Motion for Bond Determination Hearing before the Immigration Judge and submitted information regarding his ties to the United States to demonstrate that he is not a flight risk or danger and is statutorily eligible to be considered for several reliefs from removal. Ex. 2, Motion for Bond Determination (Feb. 9, 2026).

24. On February 10, 2026, the IJ denied Petitioner's motion, asserting that she lacked jurisdiction to conduct a bond redetermination because Petitioner is subject to

6

mandatory detention under INA § 235(b)(2)(A) and *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025). *See* Ex. 1.

25. Although not released through official channels, it has been widely reported that ICE internally released "interim guidance" regarding a change in their longstanding interpretation of which noncitizens are eligible for release on bond; specifically, ICE is now arguing that only those already admitted to the U.S. (typically requiring lengthy legal efforts with representation of counsel, such as adjusting status to a legal permanent resident or refugee) are eligible to be released from custody during their removal proceedings, and that all others are treated subject to 8 U.S.C. § 1225, instead of 8 U.S.C. § 1226, and will remain detained with only extremely limited parole options at ICE's discretion. Ex. 3, Interim Guidance Regarding Detention Authority for Application for Admission (July 8, 2025). This is a reversal of ICE's established practice of releasing from custody the vast majority of noncitizens in removal proceedings.

26. This new interpretation means that all noncitizens (who have not already been formally admitted) that are contacted by ICE in the interior of the U.S. will be treated as if they were an "arriving alien" at the border and subject to mandatory detention, regardless of how long they have been present in the U.S. or other equities (such as complete lack of criminal history or U.S. citizen family members including dependent children). ICE will now argue all of these noncitizens are not even entitled to a bond hearing by an IJ on the issue of release from custody.

27. Petitioner's continued detention separates him from his community and inhibits his removal defense in many ways, including by making it difficult to communicate with witnesses, gather evidence, and afford a lawyer, among other related harms.

## LEGAL FRAMEWORK

**Due Process Clause**

28. "It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in deportation proceedings." *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)), "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

29. Due Process requires that there be "adequate procedural protections" to ensure that the government's asserted justification for a noncitizen's physical confinement "outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" Id. at 690 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)), In the immigration context, the Supreme Court only recognizes two purposes for civil detention: preventing flight and mitigating the risks of danger to the community. *Zadvydas*, 533 U.S. at 690; *Demore*, 538 U.S. at 528. A noncitizen may only be detained based on these two justifications if they are otherwise statutorily eligible for bond. *Zadvydas*, 533 U.S. at 690.

30. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319,

333 (1976). To determine what process Petitioner is due, this Court should consider (1) the private interest affected by the government action; (2) the risk that current procedures will cause an erroneous deprivation of that private interest, and the extent to which that risk could be reduced by additional safeguards; and (3) the government's interest in maintaining the current procedures, including the governmental function involved and the fiscal and administrative burdens that the substitute procedural requirement would entail. *Id*. at 335.

31. Because continued custody of Mr. Mendez-Hernandez is not based on any consideration of the equities of his case—neither the likelihood of appearance, nor risk of danger to the community—and because the current procedure of mandatory detention for all aliens present without being formally admitted erroneously deprives him of his opportunity to be heard, continuous protracted detention deprives Mr. Mendez-Hernandez of due process.

**Immigration and Nationality Act and Jurisdiction over Bond Proceedings**

32. Title 8 of the United States Code, Section 1221 et seq., of the Immigration and Nationality Act ("INA"), controls the United States Government's authority to detain noncitizens during their removal proceedings.

33. The INA authorizes detention for noncitizens under four distinct provisions:

> 1) **Discretionary Detention. 8 U.S.C. § 1226(a)** generally allows for the detention of noncitizens who are in regular, non-expedited removal proceedings; however, permits those noncitizens who are not subject to mandatory detention to be released on bond or on their own recognizance.

9

2) **Mandatory Detention of "Criminal" Noncitizens. 8 U.S.C. § 1226(c)** generally requires the mandatory detention of noncitizens who are removable because of certain criminal or terrorist-related activity after they have been released from criminal incarceration.

3) **Mandatory Detention of "Applicants for Admission." 8 U.S.C. § 1225(b)** generally requires detention for noncitizen applicants for admissions, such as those noncitizens arriving in the U.S. at a port of entry or other noncitizens who have not been admitted or paroled into the U.S. and appear subject to removal from the U.S.

4) **Detention Following Completion of Removal Proceedings. 8 U.S.C. § 1231(a)** generally requires the detention for noncitizens who are subject to a final removal order during the 90-day period after the completion of removal proceedings and permits the detention of certain noncitizens beyond that period. Id. at§ 1231(a)(2), (6)

34. The instant case concerns the detention provisions at §§ 1226(a) and 1225(b).

35. Both detention provisions, § 1226(a) and§ 1225(b), were enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") of 1996, Pub. L. No. 104--208, Div. C, §§ 302-03, 110 Stat. 3009546, 3009-582 to 3009-583, 3009-585. Section 1226(a) was most recently amended earlier this year by the Laken Riley Act, Pub. L. No.119-1, 139 Stat. 3 (2025).

36. Following enactment of the IIRIRA, the Executive Office for Immigration Review ("EOIR") drafted new regulations explaining that, in general, people who entered

the country without inspection were not considered detained under § 1225(b) and that they were instead detained under § 1226(a) after an arrest warrant was issued by the Attorney General. See Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997).

37.  For nearly thirty years, the practice of the government, specifically ICE and EOIR which operate under DRS, was that most individual noncitizens that were apprehended in the interior of the United States after they had been present in the U.S. for more than two years (as opposed to "arriving" at a point of entry, border crossing, or being apprehended near the border and soon after entering without inspection) received a bond hearing. If determined to be neither a danger to the community nor a flight risk and, as a result, granted a change in custody status, the individuals were released from detention on their own recognizance or after paying the IJ determined bond amount in full. 8 U.S.C. § 1226(a)(2)(A). *See* Ex. 7, Declaration of Kerry Doyle (July 30, 2025) (explaining the decades long practice of not filing automatic stays regarding bond determinations).

38. Recently, ICE has—without warning and without any publicly stated rationale— reversed course and adopted a policy of attempting to treat all individual noncitizens that were not previously admitted to the U.S. that are contacted in the interior of the U.S. at any time after their entry as "arriving" regardless of the particularities of their case. The particularities now being ignored—all of which have historically been highly relevant to determinations regarding custody of a

noncitizen to both DHS and Immigration Courts—include: when, why, or how they entered the U.S.; whether they have criminal convictions; whether they present a danger to the community or flight risk; whether they have serious medical conditions requiring ongoing care; whether U.S. citizen family members dependent upon them to provide necessary care; or whether the noncitizen's detention is in the community's best interest. See Ex. 3. Though no public announcement of this sweeping new interpretation of these statutes was ever announced, ICE now reasons, and argued in front of the IJ at Petitioner's bond redetermination hearing, that the mandatory detention provision of § 1225(b)(2)(A) applies to all people who enter without inspection who are alleged to be subject to grounds of inadmissibility at § 1182. *See* Ex. 6.

39. In September of this year, the BIA adopted ICE's argument by holding that aliens who have not been admitted—even those present in the United States for over two years—are "applicants for admission" subject to mandatory detention under 8 U.S.C. § 1225(b)(2). *Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025),

40. As a result of ICE's interpretation and practice change, and the BIA's decision in *Yajure Hurtado*, 29 I&N Dec. 216, individual noncitizens, including long-time U.S. community members, continue to be detained by ICE and subjected to mandatory detention. This runs counter to the longstanding frameworks used by courts to determine eligibility for bond for nearly thirty years, and misinterprets the INA to erroneously subject millions of noncitizens present without admission who have

built their lives in the United States to mandatory detention under § 1225(b)(2)(A), despite not meeting the statutory requirements.

41.  Courts have long understood that the mandatory detention provisions of § 1225 address "[i]nspection of applicants for admission" and "inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled," while § 1226 applies to aliens already present in the United States. *See Martinez v. Hyde*, CV 25-11613-BEM, 2025 WL 2084238 (D. MASS. July 24, 2025) (*citing Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018)); *Lopez Benitez v. Francis,* No. 25 CIV. 5937 (DEH), 2025 WL 2267803 (S.D.N.Y. Aug. 8, 2025) ("the Court need not reach the outer limits of the scope of the phrase 'seeking admission' in § 1225(b)—it is sufficient here to conclude that it does not reach someone who has been residing in this country for more than two years, and that as someone 'already in the country,' *Jennings*, 583 U.S. at 289, [Petitioner] may be subject to detention *only* as a matter of discretion under § 1226(a)") (emphasis added).

42. Legislative history, as well as numerous court decisions including *Jennings v. Rodriguez* 583 U.S. 281 (2018) have demonstrated that §§ 1225 and 1226 each govern a distinct category of noncitizens: § 1225 governs noncitizens "at the threshold of entry," while § 1226 governs noncitizens already present inside the country. *See Jennings*, 583 U.S. at 287–9; *Johnson v. Arteaga-Martinez*, 596 U.S. 573 (2022); *Nielsen v. Preap*, 586 U.S. 392 (uncontroversially applying 1226(c) to a legal permanent resident inside the United States); *Rasel v. Barr,* 455 F. Supp. 3d 38 (W.D.N.Y. 2020); *Cortez v. Sessions*, 318 F. Supp. 3d 1134 (N.D. Cal 2018); *Dryden v.*

*Green*, 321 F. Supp. 3d 496 (D.N.J. 2018); *In re Guerra*, 24 I&N Dec. 37 (BIA 2006); *Matter of Siniauskas*, 271 I&N Dec. 207 (BIA 2018); *Matter of Akhmedov*, 29 I&N Dec. 166 (BIA 2025).

43. This distinction follows naturally from the pre-IIRIRA framework organizing immigration law around entry, providing different rights and procedures to those inside the country than to those still arriving or on the outside. *See* 8 U.S.C. § 1225–6 (1994) (formerly INA § 235–6) (pre-IIRIRA exclusion proceedings); 8 U.S.C. § 1252 (1994) (formerly INA § 242) (pre-IIRIRA deportation proceedings); *Shaughnessy v. United States ex. rel. Mezei*, 345 U.S. 206, 212 (1953). Congress preserved this inside-outside dichotomy after the IIRIRA in the two detention frameworks, §§ 1225 and 1226, by assigning mandatory detention to applicants for admission at the threshold under § 1225, and discretionary detention to noncitizens already present under § 1226. This essential, categorical split between §§ 1225 and 1226 has been implicitly adopted and presented as uncontroversial in countless cases, and confirmed by the Supreme Court of the United States in *Jennings*.

44. The categorical split along the lines of entry essential to §§ 1225 and 1226 means that no group of noncitizens could be governed by both provisions at the same time. Allowing both §§ 1225 and 1226 to apply to the same noncitizen would require that noncitizen to be both legally at the threshold of admission and legally already inside—which is a contradictory outcome.

45. Ultimately, a court cannot govern the same noncitizen under both §§ 1225 and 1226. Doing so would collapse the inside–outside dichotomy Congress intentionally preserved, deprive the statutory structure of meaning, and contradict decades of binding precedent, including *Jennings*. So, it follows, §§ 1225 and 1226 must be distinct, non-overlapping detention frameworks, with § 1225 governing those outside and at the threshold, and § 1226 governing those already present inside the country.

46. In *Matter of Yajure Hurtado*, the BIA confronted this statutory framework and nevertheless adopted an interpretation that permits §§ 1225 and 1226 to apply to the same noncitizens. The BIA essentially argues in *Matter of Yajure Hurtado* that while noncitizens present without admission are indeed present, they are still applicants for admission no matter how long they remain in the country "until and unless" they are admitted. *Hurtado*, 29 I&N Dec. at 219. In making this argument, however, the BIA seems to implicitly hold that noncitizens present without admission are also concurrently described under § 1226. That § 1226 reaches them, however, is immaterial because, again, § 1225 requires mandatory detention and, as the decision emphasizes, "[s]ection 1226 does not purport to overrule the mandatory detention requirements for . . . applicants for admission explicitly set forth in section 1225(b)(1) and (2). . . ." *Id.* Ultimately, the BIA seems to propose that noncitizens present without admission, as a whole, can be both "at the threshold" under § 1225 and "inside the country" under § 1226.

47. This interpretation produces an immediate doctrinal contradiction. *Matter of Yajure Hurtado* argues that noncitizens present without admission are applicants for admission under § 1225(b)(2)(A), implying that they are thus at the threshold without having legally affected entry, but also concedes that noncitizens present without admission who have been arrested or charged with certain crimes are governed by the provisions of § 1226(c), implying that this subset of noncitizens present without admission is truly, in the legal sense, inside the country. *See id.*; Laken Riley Act, Pub. L. No. 119-1, Stat. 3 (Jan. 29,2025).

48. Such an interpretation of Congress' drafting of the two statutes is far-fetched. It is unlikely that Congress meant, by amending § 1226(c) in the Laken Riley Act to include noncitizens present without admission who had been accused of certain crimes, that ordinary noncitizens present without admission have not affected entry while those who are accused of crimes have.

49. Ultimately, in order to read §§ 1225 and 1226 as possibly describing the same group of noncitizens in the way the BIA does in *Matter of Yajure Hurtado*, the BIA must propose effectively collapsing the structure of the inside-outside dichotomy Congress intentionally preserved, and depriving it of meaning. This is the only plausible way to apply both §§ 1225 and 1226 to the same group of noncitizens, but it creates an outcome not authorized by Congress and contradicts decades of precedent including *Jennings*.

50. Furthermore, this new interpretation runs counter to the plain meaning of the statutes. § 1225(b)(2)(A) provides that noncitizens will be examined by an

immigration officer who will determine whether they are entitled to admission, and § 1225(b)(2)(B) and (C) reference various methods of entry and arrival. This language indicates that § 1225 applies to applicants for admission who take some affirmative act to apply for admission or subject themselves to inspection. Indeed, section 1225(b)(2)(A) explicitly indicates that it only applies to applicants for admission who are "seeking admission." Noncitizens present without admission, who have lived inside the United States for more than two years, are not, without more, seeking admission in the way required by § 1225(b)(2)(A).

51. In *Matter of Lemus-Losa*, 25 I&N Dec. 734 (BIA 2012), the BIA discussed what the phrase "again seeks admission" in the context of INA § 212(a)(9)(B)(i)(II) means, and drawing from § 235(a)(1) and (b)(2)(A), concluded that just as applicants for admission could include those present in the country illegally, so too could "seeking admission" include those seeking admission through illegal means. *Id.* At 743–44. There, the BIA held that "many people who are not *actually* requesting permission to enter the United States in the ordinary sense (meaning through inspection at a port of entry) are nevertheless deemed to be 'seeking admission' under the immigration laws." *Id.* At 743.

52. In correctly reaching this holding, the BIA appears at first glance to conflate "applicant for admission" with "seeking admission." However, such a reading would render the decision internally contradictory, and therefore cannot be the correct reading of *Matter of Lemus-Losa*. In the next breath, the BIA notes that noncitizens could "seek admission" from outside the United States—for example, a noncitizen

17

could apply for an adjustment of status from their home country before attempting to enter the US at all. *Id.* At 741–2. Section 1225(a)(1), defining "applicants for admission," however, requires that applicants for admission be either arriving or present. So, while a noncitizen applying for an adjustment of status from their home country would be "seeking admission," she would not be an "applicant for admission." This means that "seeking admission" and "applicant for admission" cannot be coterminous.

53. Moreover, it cannot be the case that all "applicants for admission" are necessarily "seeking admission." Statutory construction requires that courts "give effect, if possible, to every clause and word of a statute." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 304 (2017). Section 1225(b)(2)(A) says that "in the case of an alien who is an *applicant for admission*, if the examining officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained. . . ." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). If all applicants for admission were always necessarily seeking admission by virtue of their being applicants for admission, there would be no need for Congress to include the phrase "seeking admission" in § 1225(b)(2)(A) at all. So, the argument that all noncitizens present without admission are, because they have not yet been admitted and are thus "applicants for admission," categorically "seeking admission" renders the separate phrase "seeking admission" in § 1225(b)(2)(A) meaningless. Therefore, applicants for admission cannot categorically always be "seeking admission" in the way required by § 1225(b)(2)(A).

54. Unlike the statutory definition of "applicants for admission," then, "seeking admission" must not describe a passive status or category of being—instead, "seeking admission" must refer to something that both applicants for admission and non-applicants for admission can do. It must describe a class of affirmative conduct. Case law suggests that "seeking admission" refers to affirmative conduct—such as entering, reentering, or applying for admission-related benefits—rather than mere presence. For example, Lemus Losa treats acts of entry, reentry, or adjustment-related applications as paradigmatic instances of seeking admission.

55. Noncitizens present without admission for at least two years are not, by virtue of that status alone, undertaking any affirmative act to seek admission. They are not entering, reentering, presenting themselves for inspection, or applying for an admission or adjustment of status. Therefore, they are not "seeking admission" in the way required by § 1225(b)(2)(A), and thus cannot be governed by § 1225.

56. Section 1226(a), by contrast, applies by default to all persons "inside the United States" who are "pending a decision on whether the [noncitizen] is to be removed from the United States." *Jennings v. Rodriguez*, 583 U.S. at 288.

57. In sum, the INA establishes the only authority by which noncitizens present without admission may be detained and released on bond; and within the INA, there are only two provisions possible: §§ 1225 and 1226. Sections 1225 and 1226 are categorically distinct, and operate as non-overlapping detention frameworks. This means that noncitizens present for more than two years without admission, like Mr. Mendez-Hernandez, must be governed by one or the other. Section 1225 can

19

only apply to noncitizen applicants for admission who are present for longer than two years while they are "seeking admission" in the manner required by § 1225(b)(2)(A). Mr. Mendez-Hernandez does not "seek admission" in the requisite sense merely by passively being present. Therefore, § 1225 cannot apply to him. By a simple disjunctive syllogism function, this means that § 1226 must govern the detention of Mr. Mendez-Hernandez.

58. Thus, Mr. Mendez-Hernandez's detention is properly governed by § 1226, and the IJ retains jurisdiction to determine his eligibility for release on bond.

**Board of Immigration Appeals**

59. Bond decisions issued by an IJ can be appealed by DHS or the noncitizen to the Board of Immigration Appeals ("BIA") by filing a Notice of Appeal from a Decision of an Immigration Judge (Form EOIR-26) within 30 days.

60. However, the BIA's appellate process does not offer a meaningful or timely opportunity to correct Respondent's errors.

61. According to the agency's own data, during fiscal year 2024, the BIA's average processing time for a bond appeal was 204 days, approximately seven months. Meaning for an average case where bond was granted in July 2025 it would not be heard until February 2026. See *Vazquez v. Bostock*, 3:25-CV05240-TMC (D. W.D. Wash. May 2, 2025).

62. The 204 days is only for the average case. Cases can take longer or shorter, meaning that there is no definite timeline for resolution and release.

63.  The months a person waits for appellate review deprives them of time with their spouses, children, family and community members, and liberty. Their family and community, who are often U.S. citizens or lawful permanent residents, are similarly deprived of the love, care, financial support, and meaningful contributions the detained person provides.

64.  Detained individual noncitizens are often incarcerated in jail, or jail-like settings. They are forced to sleep in communal spaces, receive inadequate medical care, and are subjected to other degrading treatment.

65.  While not all noncitizens succeed in their appeals, some do. The BIA's months-long appellate review means that for those individuals, they have spent months of unnecessary time in detention and suffered the harms outlined above.

66.  Failing to provide timely appellate review of erroneous interpretations of the INA violates the Due Process Clause.

**Petitioner's Continued Detention Violates Due Process**

67. Petitioner remains detained despite having filed for bond. The IJ's refusal to exercise jurisdiction and denial of bond has deprived Petitioner of a meaningful opportunity for release, causing ongoing and unnecessary harm to his liberty interests, family relationships, and community participation. Reading 1225 to reach non-arriving aliens like Mr. Mendez-Hernandez creates a new category of indefinite, mandatory detention for individuals far from the border often with significant due process interests.

68. Continued detention without individualized consideration of flight risk or dangerousness raises serious due process concerns under *Mathews*, 424 U.S. 319.

69. In determining whether due process has been violated, the Court should weigh: (1) the private interest affected by the government action; (2) the risk that current procedures will cause an erroneous deprivation of the private interest, and the extent to which that risk could be reduced by additional safeguards; and (3) the government's interest in maintaining the current procedures, including the governmental function involved and the fiscal and administrative burdens that the substitute procedural requirement would entail. *Mathews*, 424 U.S. 319 at 335.

70. As to the first *Mathews* factor, the private interest affected by the government action, "Petitioner's liberty interest in remaining free from governmental restraint is of the highest constitutional import." *Zauala*, 310 F.Supp.2d at 1076; see also *Ashley*, 288 F.Supp.2d at 670-71 (same)(quoting St. J*ohn v. McElroy*, 917 F.Supp. 243, 250 (S.D.N.Y. 1996)). Petitioner has been detained for over a month, preventing him from going to work, providing for his family and United States citizen children, and participating in his community.

71. As to the second *Mathews* factor, this Court must look to the risk that current procedures will cause an erroneous deprivation of the private interest, and the extent to which that risk could be reduced by additional safeguards. As explained above, the current procedures cause an erroneous deprivation of Petitioner's liberty interest in remaining free from detention. Petitioner, if granted a bond redetermination hearing, would have been likely to succeed on the merits; he has a

long, established residence in the United States for over 19 years, has strong family ties in his three United States citizen children, no criminal history to speak of, and a strong chance of prevailing in his removal proceedings. Each of these factors weigh strongly in favor of finding Petitioner neither a flight risk nor a danger to the community, and thus granting him bond pending a final determination on his removability. See *Matter of Spiliopoulos,* 16 I&N 561 (BIA 1978); *Matter of Leon-Perez*, 15 I&N 235 (BIA 1975).

72. As to the third *Mathews* factor, the government's interest in maintaining the "current" procedure is minimal here. This "policy and procedure" was never officially published by DHS and was only discovered by the press observing an intraoffice memo mere weeks ago on July 8, 2025. *See* Ex. 3. As explained above, the IJ has already made a determination that Petitioner is appropriate to be released on bond, having considered both dangerousness and flight risk. Further, DHS is still able to seek a discretionary stay before the BIA under 8 C.F.R. § 1003.19(i)(l) which would require some showing of likelihood of success on the merits. *Ashley,* 288 F.Supp.2d at 67071; *Zavala*, 310 F.Supp.2d at 1079.

73. In order to prevail on a claim asserting the deprivation of due process, a petitioner must also show "actual prejudice." *Puc-Ruiz v. Holder*, 629 F.3d 771, 782 (8th Cir. 2010) (citation omitted). Actual prejudice occurs if "an alternate result may well have resulted without the violation." *Id*. (citation omitted) (internal quotations omitted). "To show prejudice, [a Petitioner] must present plausible scenarios in which the outcome of the proceedings would have been different if a more elaborate process

were provided." *Tamayo-Tamayo v. Holder*, 486 F.3d 484, 495 (9th Cir. 2007) (citation omitted) (internal quotations omitted

## CLAIMS FOR RELIEF
### Violation of the Due Process Clause of the Fifth Amendment of the United States Constitution

74. Petitioner repeats and incorporates by reference all allegations above as though set forth fully herein.

75. The Due Process Clause asks whether the government's deprivation of a person's life, liberty, or property is justified by a sufficient purpose. Here, there is no question that the government has deprived Petitioner of his liberty.

76. The government's detention of Petitioner is unjustified. Respondents have not demonstrated that Petitioner needs to be detained. See *Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Petitioner cannot be safely released back to his community.

77. For these reasons, Petitioner's detention violates the Due Process Clause of the Fifth Amendment.

## PRAYER FOR RELIEF

Wherefore, Petitioner respectfully requests this Court to grant the following:

1. Assume jurisdiction over this matter;

2. Order the immediate release of Petitioner pending these proceedings;

24

3.  Order Respondents not to transfer Petitioner out of the District of Nebraska during the pendency of these proceedings to preserve jurisdiction and access to counsel;

4.  Declare that Respondents' actions to detain Petitioner violate the Due Process Clause of the Fifth Amendment and is *ultra vires*;

5.  Issue a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 and order Respondents to immediately release Petitioner from custody or, in the alternative, order Respondents to show cause why this Petition should not be granted within three days;

6.  Award reasonable attorneys' fees and costs for this action; and

7.  Grant such further relief as the Court deems just and proper.

Dated: February 27th, 2026
Respectfully submitted,

*Nelson Mendez-Hernandez*,
Petitioner.

By:_____
  Chinedu Igbokwe, Esq. # 23789
  Banwo & Igbokwe Law Firm, LLC
  3568 Dodge Street, Suite 100
  Omaha, Nebraska 68131
  T: (402) 345-5759
  F: (402) 345-6404
  nedu@bi-law.com;
  mail@bi-law.com